**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   In re DEEP VEIN THROMBOSIS           MDL Docket No 04-1606 VRW
     LITIGATION
12                                            ORDER

13   <u>This Document Relates To:</u>

14   Halterman v Delta Airlines, Inc,
     Qantas Airways, Limited and
15   Skywest, Inc,  No 04-3953
     _____/
16

17

18          Deep vein thrombosis (DVT) is a medical condition that

19   occurs when a thrombus (a blood clot) forms in a deep vein, usually

20   in the extremities of the leg.  DVT can lead to serious injury or

21   death if the thrombus breaks off and lodges in the brain, lungs or

22   heart, thereby causing a heart attack, stroke or other debilitating

23   effects.  Studies indicate a link between air travel and DVT, which

24   can be attributed to relatively prolonged periods of immobility

25   coupled with low cabin pressure and poor oxygenation (technically,

26   "hypobaric hypoxia").  Plaintiffs in this litigation suffered (or

27   sue on behalf of an individual who suffered) from DVT-related

28   injuries during or after travel aboard commercial aircraft.

On June 25, 2004, the Judicial Panel on Multidistrict Litigation centralized pre-trial proceedings in cases involving "complex core questions concerning whether various aspects of airline travel cause, or contribute to, the development of deep vein thrombosis in airline passengers." Doc #1 at 2. Ultimately, all transferred actions were assigned to the undersigned. On February 14, 2005, the court granted summary judgment in favor of Boeing in its capacity as manufacturer of the aircraft in question in 17 cases. Doc #144, 356 F Supp 2d 1055 (ND Cal 2005). All claims against airline defendants arising from domestic flights ("non-Warsaw cases") have been dismissed pursuant to the federal preemption rationale announced in the court's order of March 11, 2005. Doc #151, 2005 WL 591241 (ND Cal Mar 11, 2005). See also Witty v Delta Air Lines, Inc, 366 F3d 380 (5th Cir 2004).

MDL 1606 included approximately 50 cases in which plaintiffs alleged that they suffered from DVT-related injuries during or after international flights ("Warsaw cases"). On August 21, 2006, the court granted summary judgment in 37 Warsaw cases in which plaintiffs alleged liability based on asserted failure to warn regarding DVT. Doc #469, 2006 WL 2547459 (ND Cal Aug 21, 2006). The court directed entry of summary judgment under FRCP 54(b) in favor of any airline defendant against which the only Warsaw Convention accidents alleged were "the onset of DVT or the absence or insufficiency of a warning regarding DVT or policy level decisions regarding the same." Id.

\\

\\

\\

**2**

**United States District Court**
For the Northern District of California

The following Warsaw Convention DVT cases remain in MDL 1606:

<u>Dabulis v Singapore Airlines, Inc</u>, No 03-1929
<u>Richelet v Lufthansa German Airlines</u>, No 04-3831
<u>Halterman v Delta Airlines, Inc, Qantas Airways, Limited and Skywest, Inc</u>, No 04-3953
<u>Rietchel v US Airways, Inc</u>, No 01-3444
<u>Braha v Delta Airlines, Inc</u>, No 05-1544
<u>Bianchetti v Delta Airlines, Inc</u>, No 04-4860
<u>Vincent v American Airlines, Inc</u>, No 07-1604

Before the court is defendant Qantas Airways' motion for summary judgment in the <u>Halterman</u> case (Doc #27, 04-3953).  For reasons discussed below, Qantas's motion is GRANTED.


I

Except as otherwise noted, the following facts are undisputed.  In 2001 or early 2002, Greg Halterman was diagnosed with Factor V Lieden.  Doc #27, Ex A at 31:24-32:2.  According to Halterman, individuals with Factor V Leiden have blood that clots "a little bit faster than average."  Id at 31:4-13.

On October 25, 2002, Halterman was a fare paying passenger on a Skywest, Inc flight from Colorado Springs, Colorado to Salt Lake City, Utah.  Compl (Doc #4, 04-3953) ¶ 8.  Halterman thereafter connected with a Delta Airlines, Inc flight from Salt Lake City to Los Angeles.  Id.  After a four hour layover in Los Angeles, Halterman boarded Qantas Airways flight number QF94 for what he thought would be an overnight direct flight to Melbourne, Australia.  Id, Doc #613 (04-1606) ¶¶ 2-3.  Instead of flying direct to Melbourne, QF94 stopped in Sydney for a layover.  Id.  Halterman claims that the layover lasted approximately 3 hours.  Id.  Qantas represents that the layover was actually 1 hour and 57

3

**United States District Court**
For the Northern District of California

minutes.  Doc #27 at 2, n 2.  After the layover in Sydney, Halterman reboarded QF94 and flew to Melbourne, arriving on October 27, 2002.  Compl (Doc #4, 04-3953) ¶ 8.

Halterman did not experience any trauma during the flight.  Doc #27, Ex A at 105:6-9.  Halterman never requested any medical assistance from the Qantas flight attendants during the flight.  Id at 105:10-13.  Nor did Halterman advise the flight attendants that he was experiencing any type of medical emergency during the flight.  Id at 105:14-18.

Halterman testified that he first noticed pain in his right calf upon deplaning in Sydney during the layover.  Doc #613 (04-1606) ¶ 5.  Halterman attributed the pain to "having been seated for such a long period of time."  Id.  Halterman continued to experience the pain during his time in Australia and, two weeks after arriving in Melbourne, sought out medical attention.  Id, ¶¶ 5, 7; Doc #27, Ex A at 120:14-18.  Dr Michelle Wong, a physician in Australia, diagnosed DVT in the same part of Halterman's right leg where he first experienced pain when he deplaned in Sydney.  Id. Dr Wong wrote a letter, dated November 19, 2002, confirming Halterman's DVT diagnosis and associating it with the long flight from Los Angeles to Australia.  Id, Ex A.

Halterman filed his complaint on September 20, 2004.  Doc #1 (04-3953).  In addition to failure to warn, which the court has already rejected, Halterman contends that one or more of the following constituted an Article 17 accident: layover, irregular altitude, inadequate air circulation and oxygenation, inadequate pressurization, turbulence, cramped seating, inadequate hydration, improper weight balance and failure to inspect and/or make repairs

4

to defective mechanical components.  Compl (Doc #4, 04-3953) ¶¶ 8-12.  On June 8, 2007, plaintiff voluntarily dismissed defendants Delta Airlines, Inc and Skywest, Inc.  Doc ##599, 600 (04-1606).  Accordingly, Qantas is the only remaining defendant.

II

"Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." McCarthy v Northwest Airlines, Inc, 56 F3d 313, 315 (1st Cir 1995). That is, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v Liberty Lobby, Inc, 477 US 242, 248 (1986).  Further, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting its claim that a genuine issue of material fact exists.  TW Elec Serv, Inc v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).

**United States District Court**
For the Northern District of California

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u> at 322.  The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 US at 255.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249.

The evidence presented by both parties must be admissible.  FRCP 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  <u>Thornhill Publishing Co, Inc v GTE Corp</u>, 594 F2d 730, 738 (9th Cir 1979).  Hearsay statements in affidavits are inadmissible.  <u>Japan Telecom, Inc v Japan Telecom America Inc</u>, 287 F3d 866, 875 n 1 (9th Cir 2004).

III

The United States adheres to the Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, popularly referred to as the "Warsaw Convention."  49 Stat 3000, reprinted in note following 49 USC § 40105.  The purposes of the Warsaw Convention are two-fold:  "providing uniformity in respect to documentation and certain procedural matters, and imposing limitations on liability." <u>In re Aircrash in Bali, Indonesia on April 22, 1974</u>, 684 F2d 1301, 1307 (9th Cir 1982).  See also <u>Maugnie v Compagnie Nationale Air France</u>, 549 F2d 1256,

1259 (9th Cir 1977) ("[T]he Convention functions to protect
passengers from the hazards of air travel and also spreads the
accident cost of air transportation among all passengers.").

"[R]ecovery for a personal injury suffered on board an
aircraft or in the course of embarking or disembarking, if not
allowed under the Convention, is not available at all." <u>El Al
Israel Airlines, Ltd v Tseng</u>, 525 US 155, 161 (1999) (quotations
and citation omitted).  Halterman does not dispute that the injury
he sustained (DVT and resultant complications) was triggered during
"international transportation" for purposes of Article 1(2).  Nor
does Halterman dispute that the Warsaw Convention applies and
preempts all claims arising under local law.  Accordingly,
Halterman can recover from Qantas, if at all, only within the
framework established by the Warsaw Convention.

> Article 17 of the Warsaw Convention provides:
> The carrier shall be liable for damage sustained in
> the event of the death or wounding of a passenger or
> any other bodily injury suffered by a passenger, if
> the <u>accident</u> which caused the damage so sustained
> took place on board the aircraft or in the course of
> any of the operations of embarking or disembarking.

49 Stat 3018 (emphasis added).

In other words, as explained by the Supreme Court in <u>Air
France v Saks</u>, 470 US 392 (1985), a carrier "is liable to a
passenger under the terms of the Warsaw Convention only if the
passenger proves that an 'accident' was the cause of her injury."
Id at 396.  In <u>Saks</u>, the Supreme Court defined "accident" for
purposes of Article 17 as "an unexpected or unusual event or
happening that is external to the passenger."  Id at 405.  "This
definition should be flexibly applied after assessment of all the
circumstances surrounding a passenger's injuries."  Id.  And

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

because any injury "is the product of a chain of causes," a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger."  Id at 406.

When, however, "the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." Id.  And because DVT "clearly is the type of internal reaction to the normal operation of the aircraft, with no unusual external event," the development of DVT is not itself an accident within the meaning of Article 17.  Rodriguez v Ansett Australia Ltd, 383 F3d 914, 917 (9th Cir 2004), cert denied, 544 US 922 (2005).  But DVT-related injuries may be compensable under the Warsaw Convention if caused by an Article 17 accident.  With these principles in mind, the court proceeds to Qantas's motion.

## A

Qantas argues that Halterman has not produced and is unable to produce any evidence to support his allegations.  Doc #27 at 10-11.  Qantas does not possess any documents that show any malfunction on the aircraft, and Halterman has not produced any. Id at 11.  Halterman testified in a deposition that he has no reason to believe that there was irregular altitude, inadequate air circulation, inadequate oxygenation or inadequate pressurization on the flight.  Doc #27, Ex A (Halterman dep) at 101:10-25, 102:1-16, 111:11-25, 112:1-7.

Qantas also addresses Halterman's allegations that he was rendered immobile as the result of sleeping passengers, the "fasten

safety belt" sign and the flight attendants' service of in-flight meals.  Doc #27 at 14.  Specifically, in response to Qantas's request to describe every unexpected or unusual event that occurred on the subject flight, Halterman stated:

> Plaintiff Halterman was seated against the window and next to 2 larger men (6'2" or taller and 225 pounds or heavier) who blocked access to the aisle way, further limiting the ability to get up and move around on the flight and ensure adequate blood flow in the lower extremities. * * * During periods of turbulence, the seatbelt light was lit in the cabin.  When not lit, the crew served meals or beverages and their carts obstructed the aisles making it a real challenge to walk around the cabin and use the lavatory.  During these times, Mr Halterman could not get up and walk around to stretch. Instead he was forced to stay seated.

Doc #27, Ex D at 2:8-18.

Qantas points out that Halterman testified in deposition that he actually _was_ able to get out of his seat and use the lavatory "once or twice towards the end of the flight."  Doc #27, Ex A at 98:25-99:5.  Halterman also testified that he could have used the lavatory earlier but that he was being courteous to his fellow passengers because they were sleeping.  Id at 106:5-107:17. Qantas argues that it cannot be unexpected or unusual that a "bigger" passenger may sit next to "you" during a flight or that a passenger seated next to "you" might sleep during the flight.  Doc #27 at 15-16.  Qantas cites to Potter v Delta Airlines, Inc, 98 F3d 881, 884 (5th Cir 1996) in which the Fifth Circuit held that the act of sleeping during a flight is not an unusual or unexpected event.  Qantas further argues that temporary periods during which a passenger is required to remain seated due to turbulence, in-flight meal service or for other reasons are not unexpected or unusual events.  Doc #27 at 15-16.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Regarding Halterman's alleged dehydration, Qantas points out that plaintiff admitted that he had "approximately two small cups" of liquid during the flight and that he kept liquids to a minimum "so as not to have to go to the lavatory."  Doc #27, Ex D at 2:18-21.  And Halterman testified at deposition that he never made a request for a beverage that was refused.  Doc #27, Ex A (Halterman dep) at 105:2-5 ("Q: At any time during your Qantas flight from Los Angeles to Sydney, did you ever request a flight attendant to bring you a beverage that you were refused?  A: No.")

Regarding Halterman's allegation of cramped seating, Qantas points out that Halterman has produced no evidence that his seat onboard QF94 was defective in any manner.  Doc #27 at 17. Moreover, Qantas argues that being in cramped seating, even for extended periods of time, cannot qualify as an unexpected event. Id.  Qantas points to Margrave v British Airways, 643 F Supp 510, 512 (SDNY 1986), in which the Southern District of New York held that "extended sitting in an airplane, even in an uncomfortable position, cannot properly be characterized as the sort of 'accident' that triggers an airline's liability under the Warsaw Convention."

Finally, Qantas addresses Halterman's allegations of delay resulting from the rerouting of QF94 through Sydney. Halterman alleges in his complaint that:

> Apparently due to irregular circumstances deviating from the normal operation of this flight, Qantas was forced to stop in Sydney for an unplanned, unexpected, and unusual layover, deviating from the pre-planned direct flight from Melbourne. * * * At all relevant times hereto, Qantas Airways, Limited experienced an unexpected, unusual delay as a result of various factors, including but not limited to the aircraft's fuel imbalance due to a

United States District Court
For the Northern District of California

1

2

          mismanaged fuel and/or cross-feed or a mismanaged fuel
tank transfer, and/or as a result of other unexpected,
unusual and abnormal deviations from industry standards,
policies or rules.

3

Compl (Doc #4, 04-3953) at 4:7-11; 4:26-5:3.

4

          Qantas asserts that these allegations are false and that

5

Halterman cannot produce any evidence of such "fuel imbalance."

6

Doc #27 at 18-19.  Notably, Qantas submits the declarations of two

7

of the pilots on the subject flight – Geoff Paul, who flew Los

8

Angeles to Sydney on October 25, 2002, and Robert Clifton, who flew

9

Sydney to Melbourne on October 27, 2002.  Doc ##28, 29.  Qantas

10

also submits the declaration of John Xuereb, the "Manager of

11

Schedules Variation" in the Schedule Planning Department at Qantas.

12

Doc #30.  Because these declarations are the subject of Halterman's

13

evidentiary objections, the court recites their contents here.

14

Paul and Clifton both declare:

15

16

17

18

          Based on my understanding, QF94 was originally scheduled
as a direct flight from Los Angeles to Melbourne but, on
October 23, 2002, QF94 was rerouted by our Scheduling
Planning Department in Sydney to operate Los Angeles to
Melbourne with a stop in Sydney.  QF94's stop in Sydney
was pre-planned and expected by myself and the rest of
the flight crew.

19

20

21

          QF94 did not divert to Sydney as a result of any type of
fuel imbalance, fuel mismanagement, mismanaged fuel tank
transfer, or any other aircraft malfunction.  The flight
plan called for us to go to Sydney before continuing to
Melbourne.

22

23

24

          To the best of my recollection, there was nothing
unexpected or unusual about the operation of QF94 on
October 25 [and 27], 2002.  If there had been anything
unexpected or unusual regarding the operation of QF94, I
would have filed an irregularity report.  I did not file
such a report because QF94 operated as a normal flight.

25

26

27

          I do not recall experiencing any particular maintenance
issues with the aircraft operating as QF94.  In
particular, I do not recall any issues involving
irregular altitude, inadequate air circulation and
oxygenation, inadequate pressurization within the cabin
due to a faulty and abnormal pressurization system(s),

28

United States District Court
For the Northern District of California

1   turbulence, cramped seating, or inadequate hydration of
    passengers.

2   If there had been any fundamental maintenance items

3   outstanding, I would not have flown the aircraft
    operating as QF94.

4   Doc #28 (Paull Dec) ¶¶ 4-9; Doc #29 (Clifton Dec) ¶¶ 4-9.

5   Mr Xuereb declares:

6   By way of my position with Qantas, I am knowledgeable of
    the schedule planning of Qantas flights departing from
    the United States and, specifically, Los Angeles

7   International Airport ("LAX").  I was also knowledgeable
    of this schedule planning in October of 2002.

8   Qantas Flight No 94 ("QF94") operating on October 25,
    2002, was originally scheduled to be a direct flight from

9   Los Angeles to Melbourne.

10  On October 23, 2002, QF94 was rerouted by my department,
    Network Planning (Sydney), to operate Los Angeles to

11  Melbourne with a stop-over in Sydney.  QF94's stop-over
    in Sydney was pre-planned and expected.

12  The decision to re-route QF94 was made for commercial
    reasons.  The specific commercial reasons that QF94 was

13  rerouted are unknown at this time because the records
    have been routinely disposed of in accordance with

14  Qantas' document retention policy.

15  Doc #30 (Xuereb Dec) ¶¶ 3-6.

16

17                              B

18

19      In opposition, Halterman offers three events that he

    claims were unusual or unexpected and external to him: (1) delay as

20  the result of the stopover in Sydney (id at 8-10); (2) "atypical

21  turbulence which occurred during the flight that forced him to stay

22  seated" (doc #618 at 8, 11); and (3) the fact that "there might

23  have been inadequate pressurization or inadequate oxygen supply

24  because he felt that the air was stuff[y] and he felt a need to get

25  off the plane."  Id at 11.  The court addresses each argument

26  below.

27  \\

28

United States District Court
For the Northern District of California

1

Halterman first argues that the stopover in Sydney was an "accident" causing his DVT.  Qantas argues that the rerouting of QF94 cannot be an unexpected or unusual event because it was a preplanned decision.  Doc #27 at 19.  Qantas points to the Xuereb declaration as evidence that the rerouting was planned on October 23, 2002 (two days prior to Halterman's departure) and that the decision was made for commercial reasons.  Doc #30 at ¶¶ 5-6.  Because the stopover was a preplanned decision, Qantas argues, it cannot be an "accident."  Doc #27 at 19.

Halterman strenuously objects to the declarations submitted by Qantas and points to purportedly conflicting evidence.  Specifically, Halterman declares as follows:

> My understanding from the cockpit announcement shortly after takeoff from Los Angeles is that there was some type of fuel imbalance and they needed to correct the problem by stopping to refuel in Sydney before proceeding to the ultimate destination of Melbourne.  The cockpit announcement further explained that the flight was originally scheduled to continue on to Sydney after Melbourne and they were simply reversing the order of the stops due to the fuel imbalance situation and Sydney being the closer destination from Los Angeles.  At no time did the pilot communicate that this was something preplanned.  The cockpit announcement made it clear to me that this change was sudden and unexpected.

Doc #613, ¶ 4.

Halterman also testified in deposition as follows:

> Q: And was there any reason given for having to stop in Sydney?

> A: My recollection is they referred to it as a fuel imbalance where they – due to the extreme weight of the plane upon take-off they didn't think they had enough fuel to get all the way to Melbourne so they were going – as a safety precaution land in Sydney to re-fuel before continuing on to Melbourne. * * * [T]hey strictly referred to it as plane's too heavy with the fuel they could carry to make it all the way to Melbourne safely.

Doc #616, Ex F at 100:9-16, 22-24.

**United States District Court**
For the Northern District of California

Qantas responds that whether plaintiff personally expected the layover is irrelevant to the "accident" inquiry.  Doc #39 at 9.  Qantas points to <u>Husain v Olympic Airways</u>, 116 FSupp 2d 1121, 1130 (ND Cal 2000) for the proposition that the accident "inquiry is an objective one, and does not focus on the perspective of the person experiencing the injury."

Halterman cites to no authority, and the court knows of none, holding that a layover – preplanned or otherwise –  triggers an airline's liability under the Warsaw Convention.  In addition, common experience would indicate that, unfortunately, a layover is not an unexpected event in the context of international air travel.  Halterman himself admits that his various connections to Australia already included a 4-hour layover in Los Angeles.

The court does not foreclose the possibility, however, that an unplanned stopover could comprise a link in a chain of events causing injury.  Moreover, the court agrees that the evidence is in conflict as to the reasons for the stopover and whether it was in fact pre-planned.  Qantas's declarants fail to submit any documentary evidence or other foundation for their assertions that the layover – which happened almost five years ago – was preplanned and made for commercial reasons.

For purposes of this motion, the court need not reach the issue whether a layover constitutes an "accident" under the Warsaw Convention, and the court declines to do so.  Nor is it necessary to burden a jury with the issue whether <u>this</u> layover might have constituted an accident under the facts presented here.  This is

\\

**United States District Court**
For the Northern District of California

1    because Halterman cannot show any genuine issue regarding

2    causation.

3

4        The mere occurrence of an accident does not lead to

5    liability under the Warsaw Convention.  Rather, the accident must

6    have "caused the damage * * * sustained."  49 Stat 3000.  In <u>Saks</u>,

6    the Supreme Court stated that, "[a]ny injury is the product of a

7    chain of causes, and we require only that the passenger be able to

8    prove that some link in the chain was an unusual or unexpected

9    event external to the passenger."  470 US at 406.  The Supreme

10   Court also noted that Article 17 "cannot be stretched to impose

11   carrier liability for injuries that are not caused by accidents."

12   Id.

13

14       Halterman's theory here is that the stopover increased

15   the time that he was forced to sit.  Doc #618 at 10 ("Plaintiff

16   Halterman is not claiming that sitting for a long time was the

17   unusual event that caused his DVT; instead, he claims that the

18   delays of the subject flight prolonged his having to sit and they

19   themselves were the unusual events.")  But as Qantas points out,

20   the stopover made the flight into Australia <u>shorter</u> in duration

21   than if the flight had gone directly from Los Angeles to Melbourne.

22   Doc #39 at 11.  And the stopover actually afforded Halterman <u>more</u>

23   time to walk around and exercise at the airport in Sydney than he

24   would have had if the flight went directly to Melbourne.  Doc #27

25   at 19-20.  Moreover, Halterman's declaration admits that he felt

26   the pain while deboarding in Sydney as a result of sitting – not

27   <u>after</u> the stopover or <u>after</u> arriving in Melbourne or even <u>during</u>

28   the stopover at the airport.  Nothing prevented Halterman from

discontinuing his flight in Sydney.  Finally, Halterman's only other evidence of causation – a short doctor's note –  is silent on the stopover.  The note only mentions "an economy flight from Los Angeles."  Doc #613, Ex A.  Accordingly, Halterman submits no evidence supporting his claim that the stopover caused his injury, and no reasonable jury could so find under the circumstances of this case.

2

Halterman also argues that his DVT was caused by "atypical turbulence which occurred during the flight that forced him to stay seated."  Doc #618 at 11.  The only evidence of turbulence on QF94 is Halterman's own testimony.  In deposition, Halterman stated:

> Q: During your flight from Los Angeles to Sydney, did you experience any turbulence?
> A: Yes, there was turbulence on the plane.
> Q: At what point in that flight did you first experience turbulence?
> A: I first experienced it towards probably the last three hours of the flight when they were doing the breakfast service.  I was asleep most of the flight prior to that time. * * * No, I guess – let me rephrase that.  In the last like three-hour segment when I was awake for the duration of the last end of the flight probably the first 20 to 30 minutes of reawakening it was pretty bumpy.

Doc #27, Ex A at 102:17-25, 104:5-9.

In response to interrogatories, Halterman also stated that "moderate to severe turbulence was experienced during the Qantas flight – this was true during the Skywest and Delta flights as well.  During periods of turbulence, the seatbelt light was lit in the cabin."  Doc #27, Ex D at 2:12-14.

\\

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Halterman relies on Magan v Lufthansa, 339 F3d 158 (2d Cir 2003) for the proposition that turbulence can constitute a Warsaw accident.  In Magan, the plaintiff, John Magan, was a passenger on a flight from Germany to Bulgaria.  Id at 160.  Magan had left his seat to use the lavatory when he heard the pilot announce that passengers were to return to their seats and fasten their seatbelts.  Id.  The pilot made the announcement because he anticipated turbulence after observing heavy thunderstorms illuminated on his radar.  In the course of returning to his seat, the plane experienced an episode of turbulence, and Magan was violently thrown against an overhang protruding from the ceiling of the cabin.  Id.  The impact broke Magan's nose and dislodged a dental bridge from his mouth, and Magan temporarily blacked out. Id.  Magan filed a claim against Lufthansa, and the district court entered summary judgment for Lufthansa finding that the turbulence encountered by the aircraft was not "severe" or "extreme" as defined by the Federal Aviation Administration (FAA) and thus did not constitute an "accident" under the Warsaw Convention.  Id.

On appeal, the Second Circuit reviewed the Supreme Court's Saks decision and the history of Article 17 and rejected a bright-line rule of liability for particular weather events and all their attendant consequences.  Id at 163-64.  The court also found that there was conflicting testimony regarding the degree of turbulence experienced, and therefore, that there was a material issue of fact.  Id at 165-66.  Ultimately, the Second Circuit held that whether turbulence constitutes an accident should be a "fact-specific inquiry best left for resolution on an individual basis."

**United States District Court**
For the Northern District of California

Id at 165.  Accordingly, the Second Circuit reversed the grant of summary judgment and remanded for further proceedings.

The court need not decide whether <u>Magan</u> applied the proper standard.  Here it is not Halterman's contention that atypical turbulence caused direct impact or other trauma to his leg.  Rather, Halterman claims that the turbulence should constitute an "accident" because it forced him to remain seated.  This is, to say the least, a strained theory, and it carries <u>Saks</u> and <u>Magan</u> to an illogical extreme.  The court finds it appropriate to quote the Southern District of New York's order in <u>Margrave v British Airways</u>, 643 F Supp 510, 512 (SDNY 1986): "[S]uch a definition of the 'accident' at issue distorts the factual record in this case beyond recognition for the transparent purpose of forcing plaintiff's injuries into the category of those compensable under the Warsaw Convention."  As noted above, Halterman testified that turbulence on QF94 lasted only 20 to 30 minutes and that he did get up when he was able to do so.  Halterman's alleged "accident" is, in effect, "prolonged" sitting.

Even accepting Halterman's theory, it cannot be unexpected that there will be periods during a flight that a passenger is required to remain in his or her seat due to turbulence.  And it cannot have been the intent of the Warsaw Convention that basic safety precautions create liability for airlines.  To the contrary, these safety precautions are intended to prevent the type of "accidents" that <u>would</u> <u>expose</u> airlines to liability, as the facts in <u>Magan</u> illustrate.  Cf <u>Saks v Air France</u>, 724 F2d 1383, 1389-90 (9th Cir 1984) (Wallace, J, dissenting),

rev'd, 470 US 392 (1985) (intent of the Warsaw Convention was not to make carriers insurers of their passengers' well-being, but to create incentives for safe and economical air travel). Accordingly, the court follows the holdings of other courts in concluding that having to sit for long periods of times does not qualify as a Warsaw "accident." Margrave v British Airways, 643 F Supp 510, 512 (SDNY 1986)("extended sitting in an airplane, even in an uncomfortable position, cannot properly be characterized as the sort of 'accident' that triggers an airline's liability under the Warsaw Convention."); see also Scherer v Pan Am, 54 AD 2d 636, 387 NYS 2d 580 (1st Dept 1976); Toteja v British Airways, 1999 US Dist LEXIS 17374 (D Md 1999).

Moreover, Halterman was able to walk to the lavatory and did so "once or twice" by his own admission.  Halterman also admitted that he had other opportunities to walk around but voluntarily decided not to do so out of courtesy to fellow passengers.  And Halterman admitted he spent much of the flight sleeping.  It is difficult for the court to discern a triable claim arising out of the two to three hours when Halterman was awake and did have opportunities to walk around (and did walk around) against a backdrop of a significantly longer stretch of time in which Halterman was asleep and, it is safe to assume, in his seat.  These facts cast significant doubt on the proposition that prolonged sitting (or "turbulence") somehow caused plaintiff's injury.

3

Finally, Halterman argues that "there might have been inadequate pressurization or inadequate oxygen supply because he felt that the air was stuff [sic] and he felt a need to get off the

United States District Court
For the Northern District of California

plane." Doc #618 at 11. This allegation is wholly deficient, and Halterman fails to meet the "significant probative evidence" standard required to overcome summary judgment. Moreover, this allegation is contrary to Halterman's deposition testimony wherein he admitted that he has no reason to believe that there was irregular altitude, inadequate air circulation, inadequate oxygenation or inadequate pressurization on the flight. Doc #27, Ex A (Halterman dep) at 101:10-25, 102:1-16, 111:11-25, 112:1-7.

Plaintiff attempts to downplay this testimony by asking how "a passenger could possibly be in possession of such knowledge." Doc #618 at 11. The answer is simple: discovery. "[T[he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." Anderson v Liberty Lobby, Inc, 477 US 242, 257 (1986).

Qantas represents that plaintiff has never demanded to inspect or test the pressurization system or the oxygenation system of the subject aircraft and has never propounded a single discovery request regarding the pressurization or oxygenation systems. Doc #39 at 17-18. Plaintiff does not deny that he has had opportunity to propound appropriate discovery. Plaintiff has never made a motion to compel or motion for continuance to conduct further discovery. Instead, plaintiff now accuses Qantas of destroying records, stating that Qantas relies "on the passage of time as their excuse maintaining that the documents have been purged." Doc \\

United States District Court

For the Northern District of California

#618 at 12.  Plaintiff offers no support for the accusation that Qantas destroyed records on aircraft pressurization or oxygenation.

Plaintiff also attempts to overcome his evidentiary deficiency with citation to medical journals that indicate that factors such as irregular altitude and inadequate air circulation, oxygenation and pressurization "play a role in the development of DVT."  Doc #618 at 12, Doc #611, Exs A-E.  This evidence is irrelevant for purposes of Qantas's motion.  None of these articles speaks to conditions on QF94.  Accordingly, Qantas's evidentiary objections to these articles, doc #40, are sustained.

C

The only remaining issue is Halterman's FRCP 56(f) request for further discovery.  Doc #618 at 17-21.  The party seeking a Rule 56(f) continuance should demonstrate that: (1) it has set forth in affidavit form the specific facts that it hopes to elicit from further discovery; (2) the facts sought actually exist; and (3) these sought-after facts are essential to resist the summary judgment motion.  California v Campbell, 138 F3d 772, 779 (9th Cir 1998).

Whether to allow further discovery under Rule 56(f) is a subject committed to the district court's discretion.  Nidds v Schindler Elevator Corp, 113 F3d 912, 920 (9th Cir 1996).  In considering such a request, the stage of the litigation is an important consideration.  For example, if the movant has failed diligently to pursue discovery in the past, the court has discretion to deny the Rule 56(f) application.  Id.  "Failure to comply with the requirements of Rule 56(f) is a proper ground for

United States District Court
For the Northern District of California

denying discovery and proceeding to summary judgment." <u>State of California v Campbell</u>, 138 F3d 772, 779 (9th Cir 1998) (internal citation omitted); see also <u>Weinberg v Whatcom County</u>, 241 F3d 746, 751 (9th Cir 2001); <u>Kitsap</u>, 314 F3d at 1000.

As an initial matter, the court is concerned with the adequacy of the declaration - or more properly, the portion of a declaration - Halterman has filed to justify a FRCP 56(f) motion. Halterman's counsel states:

> [P]laintiff requests that based on defendant's late submission of evidence that the Court provide plaintiff Halterman additional time to take the deposition of the two pilots, Mr Paull and Mr Clifton, as well as Mr Xuereb to uncover the source of their information.  Plaintiff would likewise request an opportunity to propound a set of interrogatories to inquire what are the methods of recording the events of the subject flight as well as inquire into the sources of all their information. Plaintiff also requests an opportunity to propound a Request for Production of Documents demanding all documents referred to by the declarants, as well as reviewed, read, prepared by them in preparation of their testimony.  Plaintiff will also inquire about the preparation of the declaration and whether same was made in their own words due to the fact that both pilot declarations are identical.  In addition, plaintiff requests all documents that provided the basis for either declarant's 'understanding' as is stated in their verbatim and identical declarations should be provided. In addition, a full unredacted passenger/flight manifest should be provided to plaintiff.

Doc #616, ¶ 20.

The court does not see how the statements in counsel's 56(f) declaration identify specific facts Halterman hopes to elicit from further discovery, show that those facts exist or show that those facts are essential to resist summary judgment.  See <u>Campbell</u>, 138 F3d at 779.  Rather, it appears that Halterman is grasping at straws.

Moreover, Halterman has had ample opportunity to pursue discovery relating to his theory of the case.  Counsel for Qantas

1    represents that Halterman has never served an interrogatory

2    requesting that Qantas identify the flight crew of QF94 and that

3    Halterman never noticed depositions of the flight crew.  Doc #39 at

4    17.  Halterman submits copies of his interrogatories and requests

5    for production (doc #616, exs A-D), which confirm that Halterman

6    propounded minimal discovery.  Finally, as noted above, Halterman

7    has never made a motion to compel or motion for  continuance to

8    conduct further discovery.

9         Accordingly, Halterman's Rule 56(f) application is

10   DENIED.

11

12                                   IV

13        In sum, Halterman's FRCP 56(f) application is DENIED.

14   Qantas's motion for summary judgment is GRANTED.  Because the court

15   does not consider Qantas's declarations in deciding this motion, it

16   need not rule on Halterman's evidentiary objections to the said

17   declarations.  The clerk is DIRECTED to close the file and

18   terminate all motions in 04-3953.

19

20

21

22        SO ORDERED.

23                      _____

24                      VAUGHN R WALKER

25                      United States District Chief Judge

26

27

28

**United States District Court**
For the Northern District of California